UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

EDWARD MASTELLONE,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀No.:⠀⠀3:14-CV-433-TAV-HBG
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
PUBLIX SUPER MARKETS, INC.,⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

This civil action is before the Court on defendant's Motion for Summary Judgment [Doc. 34]. Plaintiff responded in opposition [Doc. 44] and defendant replied [Doc. 45]. For the reasons set forth below, defendant's motion for summary judgment will be granted in part and denied in part.

## I.⠀⠀Background

Plaintiff began working for defendant in 1986 in Florida, where he held various meat department positions before being promoted to a meat manager in 2001 [Doc. 34-1 pp. 7, 14–16]. A meat manager is responsible for the operations, performance results, and customer satisfaction in the store's meat department [*Id.* at 27; Doc. 39-1]. Defendant expects its meat managers to reinforce high standards for product freshness, sanitation, security, and safety guidelines [Doc. 39-1].

Defendant maintains a Meat Reference and Procedures Guide (the "Guide") that details comprehensive safety standards for handling meat and has rules regarding product rotation and maintaining product quality [Doc. 34-1 p. 28; Doc. 39-2]. The Guide

establishes rules for removal and disposal of out-of-date products from the shelves [Doc. 39-2]. Plaintiff knew that defendant prohibited the extension of sell-by dates [Doc. 34-1 p. 19]. Plaintiff further understood that if he did not follow the Guide, he could be disciplined or even terminated [*Id.* at 28].

Defendant also maintains an employee handbook that contains a provision entitled Publix's Rules of Unacceptable Conduct (the "Rules") [Doc. 39-3]. The Rules provide that, while defendant believes in coaching and counseling its employees, defendant may terminate employees without coaching, counseling, or warning [*Id.*]. Specific instances of prohibited conduct that may warrant immediate termination include dishonesty, falsifying company records, violation of safety practices, and failure to comply with rules that have been established by individual stores or departments [*Id.*].

While acting as a meat manager in Florida in April 2004, plaintiff received an Associate Counseling Statement ("ACS") for failing to follow proper meat department practices, including improperly extending the sell-by dates of ground meat product [Doc. 34-1 pp. 18, 62]. Less than a month later, plaintiff received another ACS for multiple management deficiencies, including extending the date on out-of-date ground meat product [*Id.* at 19–21, 63]. The ACS states that "any circumstances regarding to dating, inventory control or associate morale or poor job performance will result in immediate termination" [*Id.* at 63].

2

In the summer of 2012, plaintiff transferred defendant to the meat manager position at a new store opening in Knoxville—store #1416 [*Id.* at 17]. As part of his relocation from Florida to Tennessee, plaintiff signed a Relocation Package Repayment Agreement ("Relocation Agreement") [*Id.* at 22; Doc. 39]. The Relocation Agreement stated that plaintiff would be provided a relocation package, but if he separated from the company within twenty-four months after the relocation, he would be obligated to repay a portion of the relocation package based upon a graduated repayment scale described in the Relocation Agreement [Doc. 39].

Following the grand opening of store #1416, plaintiff reported to Store Manager Giuseppe "Joe" Prestigiacomo and Assistant Store Manager Christopher Huss [Doc. 34-1 p. 23]. Prestigiacomo reported to District Manager Keith Phillips for the majority of plaintiff's employment, until Roger Hinckley took over Phillips's position in September 2013 [Doc. 34-2 p. 15]. Eli Sparks was the Assistant Meat Manager in plaintiff's department for the majority of plaintiff's employment [Doc. 34-1 p. 26].

About a month after the grand opening of store #1416, on September 4, 2012, Prestigiacomo sent an email to Phillips describing a meeting he had with plaintiff about specific improvements needed in the meat department [Doc. 34-2 pp. 27, 41–42]. In the email, Prestigiacomo stated that "if [plaintiff] came to Knoxville because of the weather, to find a place to retire, to be closer to family, or because he enjoys the scenery, that he is here for the wrong reasons" [*Id.* at 41–42].

3

Plaintiff states that during his employment, Prestigiacomo referred to plaintiff as "Mr. Mastellone," but referred to other management employees by their first or last names [Doc. 34-1 p. 52]. According to plaintiff, Prestigiacomo and Huss frequently asked plaintiff about his retirement plans and this happened particularly when there were stock evaluations and after they gave plaintiff counseling statements [*Id.* at 23–24, 55]. Huss would commonly remark on plaintiff's age by making comments such as "old school," "over the hill," and "you can't teach an old dog new tricks." [*Id.* at 29].

Over the next year, plaintiff received multiple ACSs from Prestigiacomo and Huss for various issues, including failure to properly manage new inventory, failure to follow documented procedures for perishable food donations, failure to follow store policies regarding employee scheduling, failure to properly address profanity and inappropriate conversations in the meat department, and failure to ensure that the meat department met defendant's standards regarding inventory control, organization, sanitation, and product presentation [Doc. 34-1 pp. 69–70, 75–78]. Prestigiacomo also gave ACSs to other employees at the store including the grocery manager, the customer service manager, the deli manager, and the assistant meat manager [Doc. 34-2 pp. 19–20].

According to defendant's policy, meat products must be pulled from display cases the evening before the sell-by date, so that no out-of-date products are on display when customers arrive the next morning [Docs. 34-1 pp. 31–33; 39-2]. Out-of-date products are scanned out for inventory control and then disposed of in a receptacle called a fat and bone container, also called "bone barrel" or "bone can" [Doc. 34-1 pp. 32–33]. The back

4

area of the meat department contains a walk-in cooler where meat products are kept prior to being displayed for purchase [*Id.* at 31]. Out-of-date products that have been pulled from the display cases are also stored in the cooler on a separate rack, prior to being scanned for inventory control and disposed of in the fat and bone container [*Id.*].

In August 2013, District Manager Phillips transferred Archie Cook, who was born on May 29, 1981, into the Assistant Manager position [Doc. 34-4 p. 5]. When Cook was transferred to Knoxville, he was a finalist, and on the approved list of those who could become a meat manager [*Id.* at 19]. At that time, other department managers thought that Cook must have been promised plaintiff's meat manager position [Doc. 34-1 pp. 52 –53].

Cook was transferred to store #1416 when plaintiff was on vacation [*Id.* at 53]. Upon returning from vacation, plaintiff's desk had been cleared out [*Id.* at 52–53]. When plaintiff met Cook and asked about his aspirations, Cook replied that he wanted to be promoted to a meat manager and asked plaintiff "When are you retiring?" [*Id.* at 56].

Upon his return from vacation, plaintiff went to grind sirloin shortly after Cook had inventoried the cooler and found that the only box of sirloin available was already out of date [*Id.* at 53–54]. Plaintiff contends that leaving out-of-date meat available is the "modus operandi" in the meat department for taking a meat manager's job away [*Id.* at 54].

Later, before closing the meat department on the evening of September 6, 2013, a meat cutter named Harry Glover removed two semi-boneless lamb legs from the meat case that would be out-of-date the next day [Doc. 34-2 pp. 30, 43]. The following

5

morning, Cook noticed the two out-of-date semi-boneless lamb legs on the cooler rack where out-of-date meat was stored [Doc. 34-4 pp. 9–10, 25]. When Cook left work that day, the two semi-boneless lamb legs were still on the out-of-date rack in the cooler [*Id.* at 25].

Plaintiff worked the closing shift that day, along with Isaac Bond, a meat cutter [Doc. 34-1 p. 43]. According to plaintiff, he was working alone during Bond's meal break when a customer came to the counter and asked plaintiff for a boneless leg of lamb [*Id.*]. Plaintiff then went into the meat cooler, found a boneless leg of lamb, which he cut up and sold to the customer [*Id.*]. Plaintiff contends that the lamb he sold the customer was boneless—not semi-boneless—and that he cut the lamb up by hand with a knife [*Id.*]. He states that he did not check the date on the boneless-leg lamb prior to selling it because he took it from an area in the cooler where fresh meat was stored [*Id.* at 44]. Plaintiff contends that at the end of his shift, he noticed the two out-of-date semi-boneless lamb legs in the cooler [*Id.* at 43]. He scanned the two legs as out-of-date, but put them back on the out-of-date rack rather than in the fat and bone container [*Id.* at 45].

The next morning, Bond and Cook worked the first shift [Doc. 34-4 p. 6]. Bond told Cook that when he came back from his meal break the previous night, the saw was dirty with lamb leg and he had to clean it [*Id.* at 7–8; Doc. 34-2]. Cook did not believe there had been any fresh lamb leg in stock on September 7, and suspected that plaintiff may have cut and sold the out-of-date semi-boneless lamb legs in the cooler [Doc. 34-4 pp. 7–8]. Cook reported his suspicion to Prestigiacomo [Doc. 34-2 p. 29].

6

Prestigiacomo investigated the incident [*Id.* at 37]. Prestigiacomo and Huss searched the fat and bone containers and compacter, but could not find the two out-of-date lamb legs [*Id.*]. Prestigiacomo reviewed a number of documents that recorded the sale and disposal of the lamb products during the period [*Id.* at 30–31]. These documents show that a customer purchased a semi-boneless—not boneless—lamb leg at 8:25 p.m. on September 7, 2013 [*Id.* at 65]. This took place fifteen minutes after plaintiff scanned out for disposal the out-of-date semi-boneless lamb leg [*Id.* at 56]. The Weekly Item Movement Report noted that a meat department employee processed and sold a semi-boneless lamb leg on September 7, 2013, but there was nothing indicating that any boneless lamb legs were sold [*Id.* at 46]. Prestigiacomo obtained statements from Bond, Glover, and Eddie Romines, all which corroborated that plaintiff sold an out-of-date semi-boneless lamb leg [*Id.* at 43–45].

According to plaintiff, this type of investigation is not the normal protocol for this type of event [Doc. 34-1 p. 29]. Typically, defendant would have contacted a meat retail improvement specialist [*Id.*]. Furthermore, plaintiff contends that if Prestigiacomo were conducting a neutral investigation into plaintiff's explanation of what happened, then he could have reviewed the shipping weights of all the lamb in stock, boneless and semi-boneless, and this could have corroborated plaintiff's version of events [*Id.* at 50–51]. Prestigiacomo did not review the shipping weights [*Id.*].

7

Store managers do not have authority to terminate a department manager, so Prestigiacomo presented the results of his investigation to District Manager Roger Hinckley [*Id.* at 15–16]. Hinckley terminated plaintiff on September 20, 2013 [*Id.*; Doc. 34-1 p. 49]. Plaintiff sought a post-termination review, and a subsequent investigation was performed by Human Resources Investigator Michael Pierce, which upheld the basis for plaintiff's termination [Doc. 34-1 pp. 57, 79–82]. Hinckley promoted Cook to the meat manager position at store #1416 several weeks later [Doc. 34-4 p. 19].

Plaintiff filed this action alleging that defendant's actions violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, and Tennessee common law [Doc. 1]. Defendant filed an amended answer asserting counterclaims against plaintiff [Doc. 24]. Defendant alleges that plaintiff is required to reimburse defendant a percentage of the relocation package per the Relocation Agreement between the parties, as plaintiff separated from the company within twenty-four months after the relocation [*Id.*; Doc. 34-1 p. 49].

Defendant filed a motion for summary judgment requesting that summary judgment be granted in its favor on all of plaintiff's pending claims and on its breach-of-contract counter claim against plaintiff [Doc. 34].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and

8

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if a reasonable trier of fact could find in favor of the non-moving party. *Id.* The moving party bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). Accordingly, all facts and all inferences to be drawn from them must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). Likewise, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (internal quotations omitted).

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Anderson*, 477 U.S. at 250. Thus, the Court does not weigh

9

the evidence or determine the truth of the matter. *Id.* at 249. The Court also does not

search the record "to establish that it is bereft of a genuine issue of material fact." *Street*,

886 F.2d at 1479–80. In short, "[t]he inquiry performed is the threshold inquiry of

determining whether there is a need for a trial—whether, in other words, there are any

genuine factual issues that properly can be resolved only by a trier of fact because they

may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.    Analysis

Defendant filed a motion for summary judgment requesting that summary

judgment be granted in its favor on plaintiff's pending claims under the ADEA, THRA,

and other state law [Doc. 34]. Defendant also moves for summary judgment to be

granted in its favor for its breach-of-contract counter-claim against plaintiff [*Id.*].

### A.    Age-Based Discrimination Claims

Plaintiff brought age-based discrimination claims against defendant under the

ADEA and the THRA. 29 U.S.C. § 621, *et seq*; Tenn. Code Ann. § 4-21-101. The same

analysis applies to age-discrimination claims brought under the ADEA and the THRA.

*Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006).

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C. § 623(a)(1). "The purpose of the ADEA . . . is to protect

older workers from being 'deprived of employment on the basis of inaccurate and

stigmatizing stereotypes,' and to ensure that employers evaluate their employees on the basis of their merits, and not their age." *Allen v. Diebold*, 33 F.3d 674, 676–77 (6th Cir. 1994) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). There are two ways that a plaintiff can prove an ADEA violation: by direct evidence or by circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Plaintiff argues that he can survive summary judgment by direct or circumstantial evidence.

Plaintiff does not argue that any of the evidence in the record constitutes direct evidence of discrimination [Doc. 44 pp. 11–15]. Rather, plaintiff analyzes the discrimination claims in the context of circumstantial evidence [*Id*]. In light of plaintiff's decision to only address circumstantial evidence, the Court will do the same.

Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger*, 579 F.3d at 620 (citation omitted). The burden of persuasion remains on the plaintiff to demonstrate by a preponderance of the evidence that age was the but-for cause of the challenged adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see, e.g. Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Geiger*, 579 F.3d at 620 (citation omitted).

11

Discrimination claims based on circumstantial evidence are analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410-11 (6th Cir. 2008). Under the *McDonnell Douglas* framework, the burden is on the plaintiff to first establish a *prima facie* case under the relevant statute. 411 U.S. at 802. To set forth a *prima facie* case of age discrimination using circumstantial evidence, a plaintiff must establish that:

> (1) he or she was a member of a protected age class (i.e., at least forty years old); (2) he or she suffered an adverse employment action; (3) he or she was qualified for the job or promotion; and (4) the employer gave the job to a younger employee.

*Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citation omitted). This burden "is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Indeed, it is "easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)). In this case, defendant does not contest that plaintiff has met the *prima facie* elements of age discrimination [Docs. 35, 45].[1]

After plaintiff establishes a *prima facie* case for age discrimination, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.

---

[1] The Court notes that defendant does not challenge plaintiff's ability to establish a *prima facie* case of age discrimination. Rather, defendant bases its argument for granting summary judgment on the theory that plaintiff cannot establish pretext [Doc. 35 p. 13–16]. The Court, therefore, declines to analyze whether plaintiff can establish a *prima facie* case.

12

1997). "Once the defendant meets this burden, 'the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation'" as mere pretext. *Martin*, 548 F.3d at 410–11 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994)).

### 1. Defendant's Non-Discriminatory Reason for Termination

Because defendant does not contest that plaintiff can show the elements of a *prima facie* case, the burden now shifts to defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. *Kline*, 128 F.3d at 348. A defendant is not required to show that it was actually motivated by this non-discriminatory reason; it simply must raise a genuine issue of fact as to whether it discriminated against plaintiff. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814–15 (6th Cir. 2011) (citing *Burdine*, 450 U.S. at 254). As a defendant's burden is only one of production, the Court does not assess the credibility of a defendant's proffered reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Defendant has met its burden here. Defendant explains that plaintiff was terminated for violating the store policy of selling out-of-date meat [Doc. 35 p. 13]. Specifically, defendant contends that Prestigiacomo, in response to the allegation that plaintiff had sold out-of-date semi-boneless lamb leg, conducted an investigation and concluded that plaintiff has sold out-of-date meat—a terminable offense [*Id.* at 13–14]. Defendant supports its explanation with evidence from company records as well as testimony from several employees.

13

If defendant's explanation is true, defendant's action would not constitute discrimination on the basis of age. Therefore, for purposes of summary judgment review, defendant has satisfied its burden to produce a legitimate reason for its action.

### 2. Proof That Defendant's Reason Is a Pretext

The burden now shifts back to plaintiff. In this final stage of the analysis, a plaintiff must "demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano*, 663 F.3d at 815 (citing *Burdine*, 450 U.S. at 256). The burden to demonstrate pretext "merges with [plaintiff's] ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Id.* at 812 (quoting *Burdine*, 450 U.S. at 256). "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (internal quotations omitted).

The Court notes that it is insufficient for plaintiff to show that defendant's proffered reason for termination was erroneous. *Majewski v. Auto. Dating Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). "As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual because it is ultimately shown to be incorrect." *Id.* Here, therefore, is it not enough for plaintiff to show that defendant was incorrect about his selling out-of-date meat. As long as defendant had "an honest belief"

14

that plaintiff sold out-of-date meat, plaintiff cannot establish that the reason was pre-textual even if it is ultimately shown to be incorrect. *Id.*

Plaintiff can provide sufficient evidence of a pretext for unlawful discrimination "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "The three-part test need not be applied rigidly. Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (citation and internal quotations omitted).

### a. No Basis in Fact

With regard to the first factor, plaintiff argues that there is a genuine issue of material fact as to whether plaintiff sold a boneless or semi-boneless leg of lamb, whether he sold one or two legs, and whether or not the lamb plaintiff sold was out of date. The Court's inquiry, however, is not whether the facts are disputed, but whether defendant's proffered reason for terminating plaintiff has any basis in fact. The record includes evidence of a detailed investigation, conducted by Prestigiacomo, into whether plaintiff sold out-of-date meat. Prestigiacomo completed interviews of employees, collected statements from employees, inspected the workspace for evidence of what transpired, and compiled and examined company documentation, all to discern what transpired on the evening of September 6, 2013. Every aspect of his investigation, except the statements

15

from plaintiff himself, corroborated that plaintiff sold out-of-date meat. The Court finds

that, although plaintiff disputes that the event giving rise to defendant's stated reason for

termination actually occurred, defendant's stated reason does have basis in fact. *See*

*Majewski*, 274 F.3d at 1117.

### b. Did Not Actually Motivate the Termination

With regard to the second factor, according to plaintiff, a genuine issue of material

fact exists as to whether plaintiff's termination was actually motivated by the sale of out-

of-date meat, or it if was because of age discrimination.

Before turning to the analysis of this factor, the Court must determine what

evidence it will consider here, because there is a dispute between the parties as to what is

relevant evidence. Defendant argues that age-based remarks from Prestigiacomo, Huss,

and Cook are irrelevant to the question of pretext. It submits that the undisputed material

facts show that Hinckley—not Prestigiacomo, Huss, or Cook—was the decision-maker

regarding plaintiff's termination, and consequently, the others' statements are not

material. Plaintiff, however, argues that the statements should be considered because he

has provided sufficient evidence to convince a reasonable jury that Hinckley was merely

the "cat's paw," and plaintiff's claim should survive under that theory.

Under the "cat's paw" theory, a plaintiff may challenge an employer's improper

treatment even if the ultimate decisionmaker was neutral and was not motivated by

discriminatory animus. *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666,

677 (6th Cir. 2008); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 877 (6th Cir.

2001). The theory applies when a biased subordinate employee, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse employment decision. *Arendal v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008). In relying on a "discriminatory information flow, the ultimate decisionmakers [act] as a conduit" to the non-decisionmaker's prejudice. *Madden*, 549 F.3d at 679.

In determining whether an employee is a non-decisionmaker under cat's paw theory—that is, whether he is one whose animus may be imputed to an employer—a court should consider the "employee's ability to influence the ultimate decisionmaker." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 353 (6th Cir. 2012). Another consideration is the extent to which the employee can take "tangible employment actions against the victim." *Voltz v. Erie Cty.*, 617 F. App'x 417, 424 (6th Cir. 2015) (citing *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013)). "The ability to take tangible employment actions means that the individual can effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotation marks omitted) (quoting *Vance*, 133 S. Ct. at 2443).

There is no evidence in the record that Hinckley—the ultimate decisionmaker— had any age-based prejudice against plaintiff. Because Hinckley was neutral and was not motivated by discriminatory animus, in order to prevail, plaintiff must establish employer liability based on the cat's paw theory.

17

The Supreme Court found that in order to find liability under a cat's paw theory, a plaintiff must establish two elements: (1) a biased non-decisionmaker "*intended . . . to cause an adverse employment action*," and (2) the discriminatory action was "a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis in original) (applying the cat's paw theory to a claim under the Uniformed Services Employment and Reemployment Rights Act). The statute at issue in *Staub* required that the discriminatory action be a "motivating factor" in the resulting adverse employment action. *Id.* at 416–17. In contrast, under the ADEA, plaintiff retains the burden of establishing that age was the but-for cause of his termination. *Gross*, 557 U.S. at 177.

It follows that, due to the heightened standard of causation in the AEDA, cat's paw liability will apply in this case if: (1) a non-decisionmaker, because of his age bias, took actions intended to have plaintiff terminated; and (2) those actions were the but-for cause of Hinkley's decision to terminate plaintiff. *See Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014) (holding the but-for causation standard applies to cat's paw liability in Title VII retaliation claims and noting that the same standard applies under the ADEA); *see also Goodsite v. Norfolk So. Ry. Co.*, 573 F. App'x 572, 585 n.7 (6th Cir. 2014) (suggesting that the but-for causation standard adopted in ADEA and Title VII retaliation cases also applies to cat's paw liability cases) (citing *Sims v. MVM*, 704 F.3d 1327, 1335–36 (11th Cir. 2013)); *Taylor v. Donahoe*, 66

18

F. Supp. 3d 993, 1004–05 (W.D. Tenn. 2014) (concluding that the but-for causation standard applies to cat's paw liability for ADEA and Title VII retaliation claims).

The Court notes that, while plaintiff only appears to be basing cat's paw liability on Prestigiacomo's underlying actions, plaintiff also places emphasis on the age-related remarks made by Huss and Cook. The Court must, therefore, determine which employees may be considered non-decisionmakers under cat's paw theory—that is, whether the employee is one whose animus may be imputed to an employer. *See Chattman.*, 686 F.3d at 353.

Because Prestigiacomo was plaintiff's supervisor, and because he presented the investigation results to Hinckley that ultimately resulted in plaintiff's termination, there is sufficient evidence in the record to establish that he exerted influence over Hinckley. The Court, consequently, will consider Prestigiacomo's actions and statements in the cat's paw liability analysis. *Chattman.*, 686 F.3d at 353 (finding that an "employee's ability to influence the ultimate decisionmaker" is key factor in determining whether animus may be imputed to an employer).

In contrast, there is no indication in the record that either Huss or Cook had any meaningful influence over Hinckley. There is nothing to suggest that either employee spoke to Hinckley about plaintiff or suggested to him that plaintiff should be terminated. There is also no indication that either employee had the ability to take tangible

employment actions against plaintiff.[2]  *Voltz*, 617 F. App'x at 424 (including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" as "tangible employment actions"). The Court, therefore, will not consider actions or statements of Huss and Cook as evidence of cat's paw liability because they are not employees whose animus may be imputed to defendant.  *See Chattman.*, 686 F.3d at 353.

Accordingly, the cat's paw liability hinges on whether Prestigiacomo, because of his discriminatory animus, took actions intending to have plaintiff terminated.  The Court notes that discriminatory animus is "difficult to demonstrate."  *Voltz*, 617 F. App'x at 424.  It "requires a showing of prejudice, spite, or ill will."  *Id.*

To support his claim that Prestigiacomo had discriminatory animus, plaintiff refers to a September 4, 2012 email from Prestigiacomo to Phillips, in which Prestigiacomo stated that "if [plaintiff] came to Knoxville because of the weather, to find a place to retire, to be closer to family, or because he enjoys the scenery, that he is here for the wrong reasons" and he should "think about asking for a transfer back" [Doc. 34-2 pp. 41–42].  Plaintiff also points out that Prestigiacomo frequently asked plaintiff about his retirement plans [Doc. 34-1 pp. 23–24, 55].

---

[2] Although Huss was involved in the Associate Counseling Statements process, that type of action does not appear to be what the Sixth Circuit was contemplating when defining "tangible employment actions."  *See Voltz*, 617 F. App'x at 424 (finding that the animus of an employee could be imputed because he interviewed and hired candidates, determined salary increases, and made recommendations regarding termination decisions).

The fact that employees mention or ask about retirement is not evidence of age discrimination. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (holding that repeated comments regarding an employee's retirement, without more, do not show discrimination); *Metz v. Titanium Metals Corp.*, 475 F. App'x 33, 35 (6th Cir. 2012) (noting that a human resources manager's speculation about an employee's likely retirement date is not age discrimination). The Court, therefore, does not find sufficient evidence in the record demonstrating any discriminatory animus on the part of Prestigiacomo.

Furthermore, there is minimal evidence that Prestigiacomo took actions with the intention of having plaintiff terminated. The record supports the contrary. Before the alleged selling of out-of-date meat, plaintiff received multiple Associate Counseling Statements from Prestigiacomo for various issues, including failure to properly manage new inventory, failure to follow documented procedures for perishable food donations, failure to follow store policies regarding employee scheduling, failure to properly address profanity and inappropriate conversations in the meat department, and failure to ensure that the meat department met defendant's standards regarding inventory control, organization, sanitation, and product presentation [Doc. 34-1 pp. 69–70, 75–78]. Plaintiff does not dispute that the events summarized in the statements took place [*Id.* at 33–39]. Several of the offenses that prompted the ACSs are grounds for termination [Doc. 39-3]. Instead of attempting to have plaintiff terminated, however, Prestigiacomo gave plaintiff

21

many warnings and coaching opportunities. It was not until after several warnings that Prestigiacomo went to Hinckley.

Even if the Court were to assume that Prestigiacomo, because of his discriminatory animus, took actions intending to have plaintiff terminated, a reasonable jury could not find that those actions were the but-for cause of Hinkley's decision to terminate plaintiff.

In cases where cat's paw liability has been found, the termination decision results from an investigation that was tainted by a "discriminatory information flow." *See Madden*, 549 F.3d at 677–78 (6th Cir. 2008) (affirming judgment for a black employee where management relied on the biased report of a supervisor who omitted information about "virtually identical" misconduct by white employees); *see also Chattman*, 686 F.3d at 344, 393 (human resources manager "misinformed various members of upper management about the investigation process"). Here, in contrast, the record does not include any indication that the information Prestigiacomo presented to Hinckley was in any way tainted by discriminatory animus. While plaintiff may have conducted the investigation differently, Prestigiacomo conducted a thorough investigation by searching the bone barrels, questioning plaintiff and his colleagues, and reviewing detailed store records. Plaintiff does not challenge the authenticity of the information Prestigiacomo provided to Hinckley. Except for plaintiff's own statements, all the information presented to Hinckley corroborated that plaintiff sold out-of-date meat. Furthermore, after plaintiff sought a post-termination review, a subsequent investigation was

22

performed by Human Resources Investigator Michael Pierce, which upheld the basis for plaintiff's termination.

The Court finds that a reasonable jury could not determine that Prestigiacomo took actions to terminate plaintiff due to discriminatory animus. Further, a reasonable jury could not find that discriminatory animus was the but-for cause for plaintiff's termination. Accordingly, because there is no evidence in the record that Hinckley himself had any age bias against plaintiff, and because plaintiff's cat-paw liability argument fails, there is no dispute as to a material fact that selling out-of-date meat was not the actual motivation for plaintiff's termination.

### c. Insufficient to Warrant Termination

Finally, as to the third factor, plaintiff contends that there is a genuine issue of material fact as to whether plaintiff committed a terminable offense. Plaintiff, however, stated that he understood a failure to follow the Meat Reference and Procedures Guide— which included safety standards for meat a rules regarding product rotation—could result in termination [Doc. 34-1 p. 28]. Furthermore, Publix's Rules of Unacceptable Conduct provide that defendant may terminate employees without warning for specific instances of prohibited conduct under the Rules including violation of safety practices and failure to comply with rules that have been established by individual stores or departments [Doc. 39-3].

Plaintiff suggests that because he was disciplined—but not fired—in 2004 for selling out-of-date product, then selling out-of-date meat is not terminable. The Court, however, will not draw that conclusion. The employee manuals and plaintiff's own admissions make clear that selling out-of-date meat can qualify as a terminable offense. Although plaintiff was not previously terminated for committing the same offense, that does not mean he could not have been terminated.

In sum, the Court finds a reasonable jury could not conclude that plaintiff has established defendant's stated reason for termination is mere pretext for discrimination. Accordingly, the Court will grant summary judgment in favor of defendant on plaintiff's ADEA and THRA claims.

### B.   Plaintiff and Defendant's State-Law Claims

Plaintiff alleges a state-law claim for negligent infliction of emotional distress and defendant alleges a breach of contract counterclaim. While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state-law claims under the circumstances presented by this case, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001); *see, e.g., Jackson v. Town of Caryville, Tenn.*, Nos. 3:10-CV-153, 3:10-CV-240, 2011 WL 5143057, at *10 (E.D. Tenn. Oct. 28, 2011). Having found the federal claims should be dismissed on defendant's motion for summary judgment, pursuant to § 1367(c), and in the exercise of its discretion and in the interests of comity,

the Court will decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff claim and defendant's counterclaim. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725–26 (1966).

Accordingly, the Court will not grant summary judgment in defendant's favor on the state-law claims, and rather will dismiss those claims for lack of jurisdiction.

## IV. Conclusion

For the reasons explained herein, the Court will **GRANT in part and DENY in part** defendant's Motion for Summary Judgment [Doc. 34] and **DISMISS** this action. The Clerk of Court will be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

25